IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>MICHAEL DEWAYNE RHODES,<br>Defendant. | CR 26-06-BLG-KSL-1<br>MEMORANDUM OPINION AND ORDER |

Before the Court is Defendant Michael Dewayne Rhodes's Motion to Suppress. (Doc. 21). Rhodes argues that the firearm the police obtained should be suppressed because the police obtained it in violation of the Fourth Amendment. (*Id.* at 1-2). The government filed a response opposing the Motion. (Doc. 29). Rhodes filed a reply to the government's response. (Doc. 34). The Court held a hearing on August 5, 2026. (Doc. 42). Because the officers' search of Rhodes's home violated the Fourth Amendment, the Court grants Rhodes's Motion.

## I. Background

On September 18, 2025, members of the Montana Violent Offender Task Force went to Defendant Michael Rhodes's residence in Billings, Montana. (Doc. 22-1 at 1). The Task Force had an arrest warrant for Rhodes for three violent offenses: assault with a weapon, strangulation, and partner or family member assault.

(Doc. 29-1). The armed Task Force officers knocked and announced their presence two times and stated that they had a warrant. (Doc. 23, Ex. A at 14:01:00-14:01:22 [hereinafter Body Camera Footage A]). After Rhodes failed to appear, the officers opened Rhodes's door, at which point Rhodes came out of the house, and the officers took him into custody. (*Id.* at 14:01:36-46). As the marshals were escorting Rhodes to the United States Marshals Service vehicle, he requested his shoes. (*Id.* at 14:02:25). When asked, Rhodes told the officers that no one was in the house. (*Id.* at 14:03:10-14:03:13). Task Force Officer Zidack then asked the other officers to conduct a "safety clear" of the residence. (*Id.* at 14:03:40; Doc. 29-2 at 2). Rhodes again asked for his shoes. (Body Camera Footage A at 14:03:46-14:03:50).

At least four officers entered Rhodes's residence. (Doc. 29-2 at 1). The officers cleared the living room before heading toward the back of the house and into the bedroom and attached bathroom. (Body Camera Footage A at 14:04:17-14:04:49). While exiting the bathroom, Task Force Officer Kirkpatrick observed what he thought was the butt of a pistol sticking out from under a pillow. (Doc. 29-2 at 1). Task Force Officer Kirkpatrick lifted the pillow and confirmed the object was a firearm. (Body Camera Footage A at 14:04:55; Doc. 29-2 at 1). Task Force Officer Kirkpatrick asked the other officers if Rhodes was a person prohibited from possessing a firearm. (Body Camera Footage A at 14:05:01-14:05:03). Task Force Officer Kirkpatrick informed Supervisory Deputy Marshal Schally of his observations.

(Doc. 29-2 at 1). Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agents Swain and Schieno responded to the scene. (*Id.*).

Special Agent Swain reviewed Rhodes's criminal history and noted several state felony convictions in Texas and Montana. (Doc. 22-1 at 1). Shortly thereafter, Special Agent Swain determined Rhodes was prohibited from possessing a firearm due to his 2007 Texas conviction. (Doc. 29 at 3).

Rhodes was told that the officers had found a firearm on his bed. (Doc. 23, Ex. C. at 20:09:46-54 [hereinafter Body Camera Footage C]). Rhodes stated that the firearm was his ex-wife's. (*Id.* at 20:09:54-57). Special Agent Swain then asked for Rhodes's consent to enter the residence to seize the firearm. (Doc. 22-1 at 1). Special Agent Swain gave Rhodes a consent form to sign, which specified that the only area to be searched was the bedroom to seize a firearm. (*Id.* at 2; Doc. 22-2). Rhodes signed the form, and Special Agent Swain and Task Force Officer Kirkpatrick entered the residence and retrieved the firearm. (Doc. 22-2; Doc. 22-1 at 1).

A federal grand jury indicted Rhodes on one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. §922(g)(1). (Doc. 3). Rhodes now moves to suppress the firearm and ammunition evidence on the grounds that the search violated his Fourth Amendment rights. (Doc. 21).

## II. Standard of Review

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To protect this freedom, the United States Supreme Court "conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968). Federal Rule of Criminal Procedure 12(b)(3)(C) governs these motions to suppress evidence.

When a defendant challenges evidence obtained through a warrantless search, the parties bear distinct burdens in establishing whether the search violated the Fourth Amendment and whether the resulting evidence must be suppressed. The defendant bears the initial burden of establishing a Fourth Amendment violation. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). Once the defendant shows that a warrantless search occurred, however, the burden shifts to the government to establish a justification or exception to the warrant requirement. *Larez v. Holcomb*, 16 F.3d 1513, 1517 n.2 (9th Cir. 1994). If the government fails to meet that burden, the exclusionary rule generally requires suppression of evidence as "fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001). "[T]he controlling burden of proof at suppression hearings should impose no

greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## III. Analysis

The warrantless search was unlawful. Although Rhodes's request for his shoes constituted consent for the officers to enter his home, that consent did not authorize a search of his bedroom. Such a search could be lawful as a protective sweep beyond the areas immediately adjoining the place of arrest, but that requires articulable facts that a dangerous person may be present in the home, and the government identified none. Nor does the consent form Rhodes signed after the search salvage the otherwise unlawful search. Suppression is appropriate.

### A. Rhodes's request for his shoes authorized officer entry into his home.

Although Rhodes never gave written or verbal consent to enter the home, he impliedly consented to the officers entering his home when he asked them to retrieve his shoes. Indeed, a court can infer implied consent from a defendant's affirmative request that officers enter the home to retrieve personal belongings. *United States v. Rosi*, 27 F.3d 409, 412 (9th Cir. 1994). After Rhodes was arrested, he asked the arresting officers if he could obtain his shoes from inside the house. (Body Camera Footage A at 14:02:25). He made the same request again, stating that he was not "going anywhere" until he obtained his shoes. (*Id.* at 14:03:47). In response, one of the officers indicated that someone would retrieve Rhodes's shoes. (*Id.* at 14:03:50).

Multiple officers then entered Rhodes's home. (*Id.* at 14:03:50). Rhodes's affirmative request for his shoes, and his refusal to leave until he received his shoes, "necessarily evinced his consent" for the officers to enter his home. *Rosi*, 27 F.3d at 412.

**B. The search was not a valid protective sweep.**

Rhodes's consent was not to unfettered access to his entire home, so the officers' search of the bedroom and bathroom required some independent justification. The government makes no argument that Rhodes's consent authorized the officers to enter each room of his home in search of his shoes. Rather, the government argues that after Rhodes's consent placed the officers in his home, the officers' authority to conduct a protective sweep gave them access to the bedroom and attached bathroom. (Doc. 29 at 4). Rhodes disputes the lawfulness of this sweep. (Doc. 34 at 4). Because the Court finds that the sweep was unlawful, suppression of the incriminating evidence—the firearm and ammunition—is appropriate.

Officers may not conduct a warrantless search unless it fits under one of the narrow and well-delineated exceptions to the warrant requirement. *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999). One exception is when officers conduct a valid protective sweep. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "A 'protective sweep' is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.* at 327.

These protective sweeps can take two forms, and the type of sweep dictates the government's burden. *Buie*, 494 U.S. at 334. The first kind happens when officers conduct a protective sweep "incident to the arrest...as a precautionary matter and without probable cause or reasonable suspicion...[of] closets and other spaces immediately adjoining the place of arrest from which an attack could be launched." *Id.* at 334. Because the search happens in the immediate vicinity of the arrestee, the government does not need probable cause or reasonable suspicion. *Id.* In the second type of sweep, officers conduct a further protective sweep beyond the immediately adjoining areas when there are "articulable facts" which, taken together with related rational inferences, would cause a "reasonably prudent officer" to believe "that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* The standard for the second type of protective sweep "is no more and no less" than the *Terry v. Ohio*, 392 U.S. 1 (1968), standard governing investigative stops and protective frisks. *Buie*, 494 U.S. at 332-34. The *Terry* "reasonable-suspicion standard is not a particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). But requiring the government to identify "articulable facts" indicating that a dangerous person is in the area to be swept strikes the proper balance between privacy and officer safety. *Buie*, 494 U.S. at 334. A court must consider the totality of the circumstances, including "all the facts known to the officers" and the related reasonable inferences they could draw "concerning the need

to conduct a protective sweep to protect them from violence." *United States v. Castillo*, 866 F.2d 1071, 1080 (9th Cir. 1988).

At issue here is the second type of protective sweep following an arrest: the sweep of areas beyond those immediately adjoining the arrest. The officers arrested Rhodes outside of his home. (Body Camera Footage A at 14:02:01). And Rhodes's bedroom was not an area "immediately adjoining" the place of arrest, where courts routinely uphold *Buie* searches as searches incident to the arrest.[1] Because of the location of the arrest, the government must show that the officers reasonably believed someone inside the house posed a threat to the officers. *Buie*, 494 U.S. at 334; *see also United States v. Paopao*, 469 F.3d 760, 765-66 (9th Cir. 2006).

Applying that standard here, the government has identified four justifications for the protective sweep, but none—alone or together—establishes the required articulable facts. (Doc. 29 at 6). First, the government argues, the circumstances of the arrest were generally dangerous. Second, the officers were unfamiliar with Rhodes.

[1] *See, e.g.*, *United States v. Lemus*, 582 F.3d 958, 963 (9th Cir. 2009) (holding that *Buie* allowed a search of a living room when the defendant was at most only partially outside of the living room when he was arrested); *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 628 (7th Cir. 2008) (holding that it was not a constitutional violation, under *Buie,* for a police officer to enter the plaintiff's house after the plaintiff's arrest in the attached garage); *United States v. Charles*, 469 F.3d 402, 405-06 (5th Cir. 2006) (holding that *Buie* permitted a search of an open storage unit when the suspect was arrested immediately outside); *United States v. Thomas*, 429 F.3d 282, 290-91 (D.C. Cir. 2005) (holding that *Buie* permitted the search of a bedroom fifteen feet down a hallway in which the suspect was arrested); *In re Sealed Case*, 153 F.3d 759, 763, 770 (D.C. Cir. 1998) (holding that *Buie* permitted a search of a small bedroom a few feet down the hallway from the bedroom in which the suspect was arrested); *United States v. Lauter*, 57 F.3d 212, 216-17 (2d Cir. 1995) (holding that, under *Buie,* the second room in a two-room apartment immediately adjoined the first room in which the suspect was arrested).

Third, Rhodes had a criminal history. Fourth, Rhodes requested his shoes, which the government argues created a potential danger when the officers entered his home.

The generally dangerous circumstances surrounding Rhodes's arrest do not, without more, constitute the specific and articulable facts required to justify a protective sweep. There is, of course, an element of danger whenever officers arrest an individual for violent offenses. But the generally dangerous circumstances of an arrest do not meet the standard set forth in *Buie*. If this were so, then the Supreme Court in *Buie* and *Terry* would have had no need to strike a "balance" between officer safety and privacy afforded by the Fourth Amendment. *See Buie*, 494 U.S. at 334 n.2. In *United States v. Garcia*, for example, the Ninth Circuit held that the risk of officers or bystanders being caught in the line of fire, and the possibility that a fleeing suspect might join dangerous accomplices, were "speculative and generalized." 749 F. App'x 516, 520 (9th Cir. 2018). Here, the officers' concern for their safety is even more generalized than in *Garcia*. (Doc. 29 at 6).

Likewise, the officers' unfamiliarity with Rhodes, Rhodes's criminal history, and the fact that danger could have ensued following Rhodes's request for his shoes do not, without more, support a reasonable suspicion that anyone—much less someone posing a danger to the officers—was inside the home. In *United States v. Lundin*, for example, the Ninth Circuit held that a search did not fall within the protective sweep exception where the suspect had already been handcuffed and there was no

"reasonable, articulable suspicion" that anyone else was present in the home. 817 F.3d 1151, 1161 (9th Cir. 2016). Here, Rhodes was handcuffed next to an officer's car away from the home at the time of the sweep. He "no longer posed a threat" to the arresting officers, regardless of his criminal history or the officers' unfamiliarity with him. *United States v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995); *see also United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996). And the government provides no support for believing that someone besides Rhodes posed a threat in the home. In *United States v. Franco*, the Ninth Circuit concluded that the government failed to satisfy *Buie* where an officer testified that he did not believe the person who might have been present in the home posed a danger. 744 F. App'x 360, 363 (9th Cir. 2018). Here, when officers asked Rhodes whether anyone else was inside the home, he said "no." (Body Camera Footage A at 14:03:10-14:03:13). The officers did not need to take Rhodes at his word, but the government offered little else. At the August 5 hearing, Task Force Officer Kirkpatrick, the government's only witness, testified that he saw no signs that anyone else was in Rhodes's home. This case is unlike *United States v. Jefferson*, for example, where the officers' observations of gang activity in the apartment gave rise to the belief that the occupants were lying when they said no one else was present. 1992 WL 37378, at *1 (9th Cir. Feb. 27, 1992). The government did not identify the minimum facts necessary to justify the sweep.

The government's justifications here differ from the numerous instances where the Ninth Circuit has upheld protective sweeps. For example, the Ninth Circuit has upheld sweeps where officers received a tip prior to the sweep that two individuals were in the area to be swept, *United States v. Paopao*, 469 F.3d 760, 766 (9th Cir. 2006); where officers heard a "commotion inside the house" and observed a known gang member leaving the house, *United States v. Nunez*, 2022 WL 17883604, at *2 (9th Cir. Dec. 23, 2022); and where officers' surveillance revealed multiple men repeatedly visiting the place to be swept, *United States v. Jones*, 2026 WL 1122111, at *2 (9th Cir. Apr. 24, 2026). Here, the government provides no facts suggesting that another individual was present in Rhodes's home, no facts supporting an inference that Rhodes was lying when he said no one was home, and no facts indicating that the officers were in danger beyond the normal danger that accompanies an arrest.

To justify a *Buie* sweep, the government must do more than invoke a generalized—albeit important—concern for officer safety. The government must point to specific, articulable facts that someone else in the area to be swept poses a danger to the officers. Because the government failed to make that showing here, the protective sweep was not justified.

**C. Rhodes's post-search consent does not cure the unlawful search.**

The parties' briefs devote significant attention to whether Rhodes's consent was voluntary, but there is another relevant question: whether the consent form signed after the unlawful search can retroactively cure the search. Courts have routinely held that voluntary consent does not cure a Fourth Amendment violation when the person whose property was searched knew the illegal search had already occurred. *See, e.g.*, *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007); *United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000); *United States v. Hotal*, 143 F.3d 1223, 1228 (9th Cir. 1998); *United States v. Suarez*, 902 F.2d 1466, 1468 (9th Cir. 1990); *United States v. Howard*, 828 F.2d 552, 556 (9th Cir. 1987). When a defendant has such knowledge, post hoc consent "exploit[s] … the prior illegality," *Washington*, 490 F.3d at 775, because refusal to consent may feel futile— "like closing the barn door after the horse is let out." *United States v. Furrow*, 229 F.3d 805, 814 (9th Cir. 2000).

The parties do not address whether Rhodes knew about the search, but the record establishes that he did. At least one officer told Rhodes that officers had found a firearm in his bedroom. (Body Camera Footage C at 20:09:46-57; Doc. 22-1 at 1). When Special Agent Swain obtained Rhodes's consent to seize the firearm, the search had already occurred, and Rhodes knew both that the search had taken place and that it had uncovered potentially incriminating evidence. Rhodes's subsequent

consent cannot retroactively validate that search. Because the unlawful search happened prior to Rhodes's consent and because Rhodes knew of the search and its results when he consented, the Court need not determine voluntariness. By the time Rhodes consented, the horse had already left the barn: the unlawful search had occurred, and his subsequent consent could not cure it.

## IV. Conclusion

Because the protective sweep violated the Fourth Amendment, the Court **GRANTS** Rhodes's motion to suppress the firearm. IT IS SO ORDERED.

DATED this 28th day of August, 2026.

Kathleen Lane

KATHLEEN S. LANE
United States District Judge